Julius Godeny and Mary Godeny, His Wife v. Commissioner. Julius Godeny and Mary Godeny, Husband and Wife v. Commissioner.
Godeny v. Commissioner
Docket Nos. 92271, 766-63.
United States Tax Court
T.C. Memo 1963-324; 1963 Tax Ct. Memo LEXIS 22; 22 T.C.M. (CCH) 1694; T.C.M. (RIA) 63324; December 12, 1963
Robert M. Taylor, 2215 Land Title Bldg., Philadelphia, Pa., for the petitioners. Edward L. Newberger and Samuel T. Reiner, for the respondent. MULRONEY Memorandum Findings *23 of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in income tax and additions to tax in Docket No. 766-63 (1953-1955) and Docket No. 92271 (1956-1958) as follows: Sec. 293(b),
1939 Code or
Sec. 294(d)(2)
Year
Income
Sec. 6653(b), 1954 Code
1939 Code
1953
$27,372.52
$13,686.26
$1,735.34
1954
5,305.25
2,652.63
344.85
1955
5,318.41
2,659.21
1956
23,037.27
11,518.64
1957
94,996.06
47,498.03
1958
13,494.55
6,747.28 The issues are (1) whether petitioners had unreported income during the years 1953 through 1958 as computed by the net worth method; (2) whether petitioners are liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939 for the year 1953 and under section 6653(b) of the Internal Revenue Code of 1954 for the years 1954 through 1958; (3) whether the years 1953 through 1955 are barred by the statute of limitations; and (4) whether petitioners are liable for additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for the years 1953 and 1954 for substantial understatements of estimated tax in those years. Findings of Fact *24 Some of the facts were stipulated and they are so found. Julius Godeny and Mary Godeny, husband and wife, are residents of Carteret, New Jersey. They filed income tax returns for the years 1953 through 1956 with the district director of internal revenue, Newark, New Jersey, and they filed income tax returns for the years 1957 and 1958 with the district director of internal revenue at Philadelphia, Pennsylvania. Julius Godeny will sometimes hereinafter be called the petitioner. Petitioner and his wife have two children, Mary Kayler (born 1930) and Elmer Godeny (born 1933). Petitioner is an automobile sales and service dealer. He was born in Hungary in 1905 and came to Canada in 1924 where he worked at various jobs for five or six years. About 1929 he was married and in 1930 came to the United States. Petitioner operated an automobile body and paint shop in Somerville, New Jersey until 1949, when he obtained a dealership in Somerville with Nash Motors, which he operated together with the automobile body shop. Petitioner sold the Nash business in 1952, retaining and leasing the building in which that business had operated. He then purchased a Chevrolet agency in Clinton, New Jersey, *25 where he built an automobile showroom and garage. He operated the agency until 1956 when he sold this business to his son-in-law, again retaining ownership of the building. Petitioner then built a large showroom and garage at Springfield, Pennsylvania, where he operated a Chevrolet agency until 1959. This business was sold and petitioner retained ownership of the building. Petitioner now operates a Chevrolet agency in Carteret, New Jersey. Petitioner derived income for the years 1953 through 1958 from his automobile business, leasing of his buildings, rents from other real estate, interest income and occasional capital gains when real estate was sold. Petitioner's books and records were in a standard form generally prescribed by the automobile companies for the automobile agencies. During the greater part of the years before us, petitioner employed a bookkeeper to keep the automobile agency's books and records. Petitioner also employed a public accountant during this period to make monthly postings from the books of original entry to the general ledger. The public accountant also prepared annual returns for petitioner on the basis of financial statements prepared by petitioner's *26 bookkeeper. Petitioner's books and records for 1956 disclosed no postings after November 30 of that year. During the year 1956 petitioner sold more than 20 new automobiles to Jolley's Auto Exchange, a car dealer in Stroudsburg, Pennsylvania. Petitioner was paid by Jolley's Auto Exchange for these automobiles by cash or check. Petitioner did not show in its books that these car sales were made to Jolley's Auto Exchange. Instead, the sales invoice was made out by petitioner to the ultimate purchaser of the car from Jolley's Auto Exchange. In connection with 19 of these sales to Jolley's Auto Exchange in the amount of approximately $37,400, petitioner recorded fictitious tradeins accepted from the purchasers of the cars, and then petitioner showed the sales of such nonexistent trade-ins at prices that were usually much lower than the purported trade-in allowances. A representative transaction would be as follows: (1) petitioner sold a new car to Jolley's Auto Exchange on May 17, 1956 for $1,875 and received a check for that amount; (2) petitioner made out a sales invoice for the car to the ultimate purchaser from Jolley's Auto Exchange showing a sales price of $2,480.75 and a trade-in *27 allowance of $1,105.75 on a fictitious trade-in; and (3) petitioner then recorded a sale of the fictitious trade-in for $500. During 1956 petitioner recorded petitioner's trade-in allowances amounting to about $16,850 on the 19 sales of new cars to Jolley's Auto Exchange in that year. Petitioner also recorded the amount of approximately $7,500 from the purported sales of the petitioner's trade-ins. In his 1957 income tax return the petitioner showed the cost of the building built in Springfield, Pennsylvania in 1957 for his Chevrolet franchise in the amount of $145,932.68. Petitioner used this cost in both the 1957 and 1958 income tax returns to compute depreciation on the building at a rate of 2 percent per year. The purported cost of $145,932.68 was inflated by the amount of $44,180.73 over the amounts actually paid by petitioner to the contractors through the device of raising the amounts of certain checks. Petitioner cashed some of the checks payable to various contractors and later increased the face amounts by adding several digits so that when they cleared his bank account the withdrawal amounts would be higher than the actual amounts paid to the contractor. It is stipulated *28 that the following checks were raised by the petitioner: Actually
Name of Contractor
Date
Amount
Paid
Raised By
Irving Pederson
9/ 6/57
$ 3,060.00
$ 60.00
$ 3,000.00
Irving Pederson
9/13/57
2,114.13
2,114.13
Frank Capone
9/ 4/57
675.00
675.00
Frank Capone
10/23/57
12,500.00
50.00
12,450.00
Frank Capone
12/30/57
1,441.60
440.00
1,001.00
Del. Valley, Plumbing
10/25/57
4,016.25
1,016.25
3,000.00
Landa Construction
9/16/57
6,000.00
60.00
5,940.00
Landa Construction
10/ 8/57
2,925.24
925.24
2,000.00
A. J. Marcellus, Inc.
10/ 2/57
1,240.00
40.00
1,200.00
A. J. Marcellus, Inc.
10/14/57
4,167.55
167.55
4,000.00
Ross Bros.
9/20/57
2,256.00
256.00
2,000.00
V. Tomlinson
9/21/57
1,300.00
300.00
1,000.00
R. A. Armstrong
9/ 6/57
755.00
55.00
700.00
John R. McCoy
9/15/57
215.00
15.00
200.00
John R. McCoy
9/27/57
113.50
13.50
100.00
James Floyd
9/16/57
315.00
15.00
300.00
Wardel Murray
9/28/57
112.00
12.00
100.00
Edward Bowden
9/21/57
$ 215.00
$ 15.00
$ 200.00
John Bunn
9/28/57
110.00
10.00
100.00
John Bunn
10/10/57
166.50
66.50
100.00
Suburban Giass
10/ /57
4,835.14
835.14
4,000.00
Total
$48,532.91
$4,352.18
$44,180.73
*29 In arriving at the cost of the building in the amount of $145,932.68 the petitioner included in this total certain items totaling $2,950.06, which were duplicated in the Investment Account of Godeny Chevrolet under Equipment, and depreciation was taken by petitioner on the $2,950.06 under both the building and the equipment account. It has been stipulated that the cost of the Springfield building should be reduced by these duplications. Certain payments made by petitioner in 1958, totaling $3,059.89, were included in the purported $145,932.68 building cost in petitioner's 1957 income tax return for depreciation purposes. It is stipulated that the cost of the building as of December 31, 1957 should be reduced by this amount. Petitioner in his 1958 income tax return claimed depreciation for a sign acquired at a cost of $1,529.27 on December 10, 1957 and for a sign acquired on December 31, 1957 at a cost of $1,500. It has been stipulated that petitioner had only one sign. Petitioner failed to report total gain of approximately $200 realized from proceeds of endowment policies in 1956 and 1958. Petitioner also failed to report interest of about $125 received in United States Government *30 bonds cashed by him in 1958. Petitioner failed to report interest on United States Government bonds cashed by him in 1954 and 1955. Respondent computed petitioner's income for the years 1953 through 1958 by use of the net worth plus nondeductible expenditure method. With the exception of the few items so indicated, all of the items used by respondent in computing petitioner's income have been stipulated. Respondent's computation is as follows: ASSETS
12/31/52
12/31/53
12/31/54
12/31/55
Cash on Hand *
Cash in Banks
$ 20,844.70
$ 4,327.65
$ 795.29
$ 27,601.85
Investments: Godeny Chevrolet
47,537.81
54,008.39
78,108.22
106,479.48
Real Estate
146,541.19
207,116.39
213,755.36
192,321.37
Loans Receivable
39,150.00
30,950.00
36,200.00
34,299.15
United States Bonds
618.75
618.75
450.00
375.00
Deposit on Real Estate
Total Assets **
$254,692.45
$297,021.18
$329,308.87
$361,076.85
LIABILITIES
Reserve for
$ 1,757.83
$ 3,069.38
$ 5,356.16
$ 8,193.44
Depreciation -
Equipment
Reserve for
15,441.99
18,711.86
23,784.10
24,217.52
Depreciation - Real
Estate
Duplicated in
(187.44)
(1,295.94)
(5,005.17)
(6,959.40)
Investment Account
Accounts Payable
6,473.21
Mortgages Payable
Loans Payable - GMAC
Security Deposit on
4,500.00
4,500.00
4,500.00
Rental Property
Total Liabilities
$ 17,012.38
$ 31,458.51
$ 28,635.09
$ 29,951.56
Net Worth
$237,680.07
$265,562.67
$300,673.78
$331,125.29
Increase in Net Worth
27,882.60
35,111.11
30,451.51
Living Expenses
3,500.00
3,500.00
3,500.00
Taxes Paid
12,687.88
5,418.46
5,301.99
LIABILITIES
Adjustments: Capital Gains
($129.00)
($161.25)
($4,154.03)
(Nontaxable portion)
Insurance (Nontaxable)
Unallowable loss
Corrected Income
$ 43,941.48
$ 43,868.32
$ 35,099.47
18,581.39
Reported Income
30,648.77
23,942.95
24,703.51
Unreported Income
$ 13,292.71
$ 19,925.37
$ 10,395.96
*31 ASSETS
12/31/56
12/31/57
12/31/58
Cash on Hand *
Cash in Banks
$ 11,422.79
$ 1,210.95
$ 13,242.19
Investments: Godeny Chevrolet
117,880.10
113,623.79
111,374.44
Real Estate
193,321.37
351,735.79
345,117.53
Loans Receivable
40,715.78
12,665.78
24,000.00
United States Bonds
375.00
375.00
Deposit on Real Estate
4,000.00
Total Assets **
$367,715.04
$479,611.31
$493,734.16
LIABILITIES
Reserve for
$ $ 829.25
$ 3,837.86
Depreciation -
Equipment
Reserve for
29,031.87
34,138.07 *
41,091.86 *
Depreciation - Real
Estate
Duplicated in
(1,716.65)
(7,828.86)
Investment Account
Accounts Payable
Mortgages Payable
20,000.00
Loans Payable - GMAC
25,000.00
Security Deposit on
4,500.00
4,500.00
4,500.00
Rental Property
Total Liabilities
$ 33,531.87
$ 82,750.67 *
$ 41,600.86 *
Net Worth
$334,183.17
$396,860.64
$452,133.30
Increase in Net Worth
3,057.88
62,677.47
55,472.66
Living Expenses
4,000.00
8,180.00
5,000.00
Taxes Paid
7,857.33
3,321.00
4,866.33
LIABILITIES
Adjustments: Capital Gains
(360.12)
(798.99)
(2,560.60)
(Nontaxable portion)
Insurance (Nontaxable)
(1,865.94)
(864.54)
Unallowable loss
5,892.24 *
Corrected Income
73,379.48
61,913.85
Reported Income
15,783.36
16,354.44
48,525.03
Total
Unreported Income
$ 2,798.03
$ 57,025.04
$ 13,388.82
$116,825.93
*32 No part of the deficiencies or underpayments in tax for the years 1953, 1954 and 1955 was due to fraud with intent to evade tax. Petitioner's income tax returns for the years 1953, 1954 and 1955 were not false or fraudulent with intent to evade tax. A part of the petitioner's underpayment of tax for each of the years 1956, 1957 and 1958 was due to fraud. Opinion Respondent, in his statutory notice of deficiency, computed petitioner's unreported income for the years 1953 through 1958 under the net worth method as follows: $43,067.45, $11,952.16, $11,795.96, $40,259.05, $143,411.40 and $22,085.77, respectively. After the stipulation by the parties of all items except cash on hand as of December 31, 1953 through 1958, the Reserve for Depreciation - Real Estate for the years 1957 and 1958, and the disallowed loss on the sale of inventory and equipment by petitioner to his son-in-law in 1956, the petitioner's unreported income, as determined by the respondent's net worth method, for the years 1953 through *33 1958, was as follows: $13,292.71, $19,925.37, $10,395.96, $2,798.03, $57,025.04 and $13,388.82. Petitioner contends that he kept adequate books and records for the years here involved and that the respondent was not justified in computing unreported income for this period by using the net worth method. Petitioner's contention is without merit. Where a net worth computation shows increases in net worth greater than that reported on a taxpayer's returns, or is not consistent with his records, then the net worth computation is evidence that there is unreported income and that the records, though seemingly complete on the face, are inadequate, inaccurate or false. Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871; see also Holland v. United States, 348 U.S. 932. It appears that petitioner's records for some of the years before us were far from adequate, in that they were incomplete and, in some instances, without proper documentation. It also appears that petitioner did not hesitate, during some of the years, to falsify his records. We are persuaded that respondent had ample justification to resort to the net worth method. We have reached the *34 conclusion that petitioner's underpayments of tax for the years 1953, 1954 and 1955 were not due to fraud within the meaning of section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954. We have also found that petitioner's returns for 1953, 1954 and 1955 were not false or fraudulent with intent to evade tax within the meaning of section 276(a) of the Internal Revenue Code of 1939 and section 6501(c) of the Internal Revenue Code of 1954. Consequently, these three years are barred by the statute of limitations. Section 275(a) of the Internal Revenue Code of 1939 and section 6501(a) of the Internal Revenue Code of 1954. Our discussion of the fraud issue will appear later in the opinion. There is no statute of limitations issue before us as to the years 1956 through 1958. Respondent's net worth computation indicates that petitioner had unreported income of $2,798.03, $57,025.04 and $13,388.82 in 1956 through 1958. In the net worth computation respondent shows that petitioner had no cash on hand as of December 31, 1952 through 1958. This is one of the disputed items, *35 and on this question the petitioner has the burden of proof. Petitioner testified he "lost a little money" in a bank when it closed back in the depression years of the thirties. He said that since then he kept currency in a safe in his home rather than deposit it for as he said "you are always afraid it might happen again." This record does not indicate petitioner had much hesitation about having large amounts of money on deposit in banks. He carried accounts in two banks during most of the years involved and his balances were often substantial - as much as fifty or sixty thousand dollars. Petitioner contends he had approximately $105,000 in his home safe and in his safe deposit box as of December 31, 1952. He also states that, as of December 31, 1955, he had approximately $75,000 in the safe and $10,000 in each of two deposit boxes in two different banks. It is difficult to understand what advantage petitioner would have in claiming that he had opening cash of $105,000 on December 31, 1952 and $95,000 at the close of 1955. We are given no satisfactory evidence as to the cash on hand as of December 31, 1953 and 1954. Obviously, if his cash on hand remained fairly constant during *36 this period, it would have no significant effect on the increases or decreases in net worth for these years, and none of the stipulated increases in net worth in 1953, 1954 and 1955 would be attributed to the opening cash hoard. But our concern here is with the purported cash hoard on hand as of December 31, 1955. We do not give much credence to the testimony of the witnesses who testified that they saw or knew of the $75,000 in the home safe on or about December 31, 1955. Petitioner's wife, his son, his daughter, his daughter-in-law, and the latter's mother all testified that they either counted the money or knew petitioner had that sum at the end of 1955. Two other witnesses, Steve Wargo (petitioner was his uncle) and Kalman Konya testified that petitioner had about $75,000 in the safe on December 9, 1954. The bias of most of the witnesses is obvious. We have examined their testimony and we find it implausible and not at all persuasive. Moreover, even if we should accept petitioner's story of the $95,000 on hand as of December 31, 1955, it will not avail him much since there is no satisfactory evidence as to the amount of cash on hand at the end of 1956, 1957 and 1958. Again, *37 if the amounts of cash on hand at the end of the years 1956 - 1958 remained fairly constant, it would not explain the varying increases in petitioner's net worth for those years. Finally, there is in evidence an application by petitioner to General Motors Corporation dated August 8, 1957 for a Chevrolet Dealer Selling Agreement which states that petitioner had $200,000 in cash as of that date. Petitioner testified that this application was "pretty accurate", and that "what is on [the application] is correct, but there is a lot of assets that's left out of it." There is no indication in the record to show that petitioner consumed this cash by the end of 1957 and 1958. The stipulated assets as of December 31, 1957 and 1958 show otherwise. It is patently obvious that if petitioner did, in fact, have anything remotely approaching $200,000 on hand as of the end of 1957 and 1958, the purported opening cash figure of $95,000 as of December 31, 1955 does not explain away the increases in petitioner's net worth in 1956, 1957 and 1958. On the basis of this record we find that petitioner did not have any cash on hand as of December 31, 1955. We also find that petitioner did not have any cash *38 on hand as of December 31, 1956, 1957 and 1958. Respondent is sustained as to this item. A second item in dispute is the Reserve for Depreciation - Real Estate as of December 31, 1957 and 1958. Respondent determined that this reserve was $34,138.07 and $41,091.86 at the end of 1957 and 1958, respectively, while petitioner contends that these amounts should be $35,701.10 and $43,984.49, respectively. The depreciation reserve in dispute pertains to the Springfield building constructed by petitioner in 1957. The cost of this building has now been stipulated. Respondent computed depreciation on this building for 1957 and 1958 at a rate of 2 percent, which is the same depreciation rate used by petitioner in his returns for 1957 and 1958. Petitioner now seems to argue that he is entitled to compute depreciation by using the component grouping method, by segregating into groups the structure of the building, roofs, floors, electric fixtures, wiring, plumbing, painting, pits for lifts, ceilings, air conditioners and miscellaneous items. Petitioner has introduced no evidence to support his position. Practically all that we have is the bare assertion that petitioner wants a change. We find *39 that petitioner has not met his burden of showing that he is entitled to depreciation in 1957 and 1958 in excess of the amounts determined by respondent. Petitioner also disputes the amount of $5,892.24, which respondent, in the net worth computation, treats as an unallowable loss on the sale of certain inventory and equipment by petitioner in 1956. About all we have on this is an unsupported recitation of various figures by petitioner's accountant. The testimony is vague and unsatisfactory. We cannot say that petitioner has met his burden as to this item. Respondent determined that a part of the deficiencies or underpayments of tax for each of the years 1953 through 1958 was due to fraud with intent to evade tax. The burden rests upon respondent to prove fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. It is never imputed or presumed. Mere suspicion of fraud is not sufficient. On the basis of the entire record we have reached the conclusion that no part of the deficiency or underpayment of tax for the years 1953, 1954 and 1955 was due to fraud. There is no evidence indicating any irregularities in petitioner's books for these three years or *40 any evidence indicating omissions of specific items of income. Petitioner employed bookkeepers to record the daily transactions and a public accountant to work on the books monthly and to prepare annual returns from financial statements based on such books. Petitioner's bookkeeper from December 1953 to November 1956 appeared as a witness and testified as to the accuracy of the books for that period. She was not cross-examined by respondent. The record also shows that petitioner sold his Nash agency in 1952, just before the start of the period before us, and acquired a Chevrolet agency. We might readily speculate that any understatements of income for the years 1953 - 1955 were produced by lack of familiarity with the new accounting system (required by General Motors Corporation) or, perhaps, by an honest ineptitude with the books and records. However, we need not speculate. It is enough to state that, on the record, we are not satisfied that respondent has shown fraud for the years 1953 - 1955 in a clear and convincing manner. Our finding above also disposes of the statute of limitations issue as to these same three years. We find, and so hold, that petitioner's returns for the years *41 1953 through 1955 were not false or fraudulent with intent to evade tax and, consequently, these three years are barred by the statute of limitations. As for the years 1956, 1957 and 1958, we think the record tells a different story. Merely to refer to the indicia of fraud, as demonstrated by respondent, will suffice. During the year 1956 petitioner falsified his records in connection with the sale of new cars to another car dealer by indicating nonexistent trade-ins and by recording on his books the purported sale of the nonexistent trade-ins at prices that were usually much lower than the purported trade-in allowances. It is quite evident that this device, which was used by petitioner on some 19 sales of new cars, served to mask a portion of petitioner's profit realized on car sales. Petitioner testified he was obligated to General Motors to take these new cars and the only thing he could do was sell them at cost; that he had to show them as sales to consumer purchasers so General Motors and the local Chevrolet dealer would not know he was actually selling to Jolley, who was a car dealer. That such entries were deliberately made to deceive General Motors is no excuse when the *42 ordinary operation of the fictitious entries in books used to compute income will defraud the Government of tax. During 1957 petitioner inflated the cost of his Springfield building by more than $40,000 through the device of raising the amounts of certain checks. [1] Petitioner claimed depreciation deductions in both 1957 and 1958 based upon the inflated costs of the building, which costs he obviously knew were false. Certain expenditures made in 1958 were included in the 1957 building costs for depreciation purposes. There was a duplication of an asset (a sign costing about $1,500) for depreciation purposes in 1958. Petitioner also failed to report gains realized from the proceeds of endowment policies in 1956 and 1958. Finally, there were understatements of income for these three years as shown by respondent's net worth computation, based for the most part on stipulated items, which totaled about $73,000. On the basis of the whole record, we find, and so hold, that a part of the petitioner's underpayment of tax for each of the years 1956, 1957 and 1958 was due to fraud within the meaning of section 6653(b) of the Internal Revenue Code of 1954. *43 Decisions will be entered under Rule 50. Footnotes
*. No agreement on this item. ↩
**. This amount does not include any cash on hand (exclusive of any amounts of cash on hand which are included in Investments: Godeny Chevrolet).↩
1. Petitioner's only excuse for raising the costs of his building on his books was to be able to show Chevrolet high building costs if Chevrolet ever complained his building was inadequate.↩